UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:24-CR-0283 |
| | : | |
| v. | : | (Judge Mannion) |
| | : | |
| BRAYAN GARCIA-VAZQUEZ, | : | (Electronically Filed) |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Brayan Garcia-Vazquez is scheduled to appear before this Court for sentencing on April 1, 2026, after pleading guilty to one count of production of child pornography, in violation of 18 U.S.C. § 2251(a). The government submits this brief sentencing memorandum to address Garcia-Vazquez's objections and will reserve argument on the § 3553(a) factors for sentencing.

## BACKGROUND

On May 14, 2023, a woman and her twelve-year-old daughter arrived at East Pennsboro Township Police Department to report that an adult male had recorded himself having sexual intercourse with the child and had distributed that video. The adult male is now known to be the defendant, Brayan Garcia-Vazquez. The video had been sent to the mother via text message the previous day by a former friend of the minor victim. East Pennsboro police directed the

mother to email the video to Detective Owens, who would follow up the next morning.

The video's metadata indicated it had been created on or about April 5, 2023. Although no faces appeared on screen, the mother confirmed several identifying details linking the minor victim in the video to her daughter: the girl's distinctive hair and fingernails, her pink blanket, and the recognizable furnishings of the bedroom she shared with her mother in Cumberland County. Garcia-Vazquez was not facially visible either, but his arm tattoos were clearly captured on film. When the mother confronted her daughter, the minor victim initially denied appearing in the video. Law enforcement completed a Child Line Report based on the information gathered that day.

The investigation moved forward over the following weeks. On May 19, 2023, Detective Owens visited the family's residence, spoke with both the mother and the minor victim, and provided the child with her business card. Eleven days later, the minor victim participated in a Child Advocacy Center forensic interview. During that interview, she disclosed that the video depicted her having sex with Garcia-Vazquez, and she confirmed that he had known she was twelve years old at the time of the encounters. East Pennsboro detectives subsequently conducted a second interview with the minor

victim during which she provided additional details about the circumstances of the encounter.

Two days after that second interview, the mother and the minor victim returned to East Pennsboro Police Station to elaborate further. The minor victim explained that she had first made contact with Garcia-Vazquez approximately one year earlier through Instagram. After a period of online communication, Garcia-Vazquez told her he would be in her area and asked whether he could come to her home. She agreed. He visited on two separate occasions, each time arriving while her brother was at school and her mother was at work.

On the first visit, Garcia-Vazquez and the minor victim had sexual intercourse. On the second visit, he arrived with gifts: a gold bracelet with two interlocking hearts—one engraved with the letter "b," the other with the letter "k"—and a Starbucks drink. They again had sexual intercourse, and this time Garcia-Vazquez took video of the sexual encounter. The minor victim provided law enforcement with the gold bracelet as physical evidence. The minor victim acknowledged that she had consented to the sexual activity, that she had been aware Garcia-Vazquez was recording, and that she did not believe he had shared the video with anyone other than her. Upon receiving the video, she uploaded it to the "My Eyes Only"

section of Snapchat—a password-protected feature—believing her mother would not find it there.

The minor victim was reluctant to provide information that might incriminate Garcia-Vazquez, and her recollections of identifying details were correspondingly vague. She could not produce his phone number or any social media usernames, recalling only that his Snapchat handle began with "b_g." She believed he was in his twenties, that he was originally from Florida, and that he worked as a homebuilder. Both the mother and the minor victim signed consent-to-search forms authorizing law enforcement to examine the child's cell phone.

Detective Owens conducted a manual preview of the phone while awaiting a full forensic examination. That preview revealed a text conversation between the minor victim and a friend (presumably a minor and therefore referred to as "Jane Doe" here) dated May 20, 2023—the day after Detective Owens had first visited the family's home and left her business card. In those messages, the minor victim and Jane Doe discussed the police investigation and the minor victim's desire to warn Garcia-Vazquez. Unable to recall his social media handles or his name, the minor victim enlisted Jane Doe's help. Jane Doe attempted to call the number the minor victim had for Garcia-Vazquez but reached a voicemail with a

female voice. The minor victim then attempted to contact him directly, calling the number and sending two text messages:

"You need to answer me right now! It's [minor victim]."

"This is hella important!"

Working from the telephone number associated with the then-unknown male, East Pennsboro officers identified the suspect as Brayan Yael Garcia-Vazquez. When the minor victim was shown a photograph of Garcia-Vazquez, she confirmed without hesitation that he was the individual she had had sexual intercourse with on both occasions.

The investigation then extended across state lines. Detective Owens contacted the Havelock Police Department in North Carolina, where Garcia-Vazquez was believed to reside. North Carolina detectives conducted a check of his residence and located two vehicles on the property: a blue car and a gray or silver vehicle. The minor victim confirmed that the blue vehicle matched the car Garcia-Vazquez had driven to her home on his second visit.

Garcia-Vazquez was arrested at his Havelock residence on April 17, 2024. At the time of his arrest, Havelock police photographed the tattoos on his arm. A comparison of those photographs to the visible tattoos in the child-pornography video confirmed that the markings were identical, corroborating the minor victim's identification and establishing that Garcia-Vazquez was the adult male

who had recorded himself engaged in sexual activity with a twelve-year-old child.

## LEGAL FRAMEWORK

For most of the post-*Booker*[1] era, courts followed a three-step sentencing framework: calculate the guideline range, apply any guideline-authorized departures, and then fashion a sentence based on an individualized assessment of the defendant and the 18 U.S.C. § 3553(a) factors.

The United States Sentencing Commission's 2025 simplification amendments consolidated this structure into a two-step process: the court calculates the guideline range as the "starting point and initial benchmark," and then considers the § 3553(a) factors to determine whether to impose a sentence within or outside that range. U.S.S.G. § 1A1.1 cmt. (citation omitted).

## DISCUSSION

The government agrees with the presentence report's calculation of the sentencing guidelines here. Garcia-Vazquez objects on several bases: (1) that applying both U.S.S.G. §§ 2G2.1(b)(2)(A) and 4B1.5(b)(1) results in impermissible double counting; (2) that the distribution enhancement in § 2G2.1(b)(3) should not apply; (3) that § 2G2.1(b)(6)(B)(ii) is arbitrary given the ubiquity of cell

---

1 *United States v. Booker*, 543 U.S. 220 (2005).

phones; (4) the total offense level should be less than 40 in light of these objections; and (5) the Chapter Four "pattern" enhancement should not apply here. Def.'s Sent'g Mem. 5, Doc. 49; PSR Addendum 4–8. This memorandum briefly addresses Garcia-Vazquez's objections.

## I. Applying both U.S.S.G. §§ 2G2.1(b)(2)(A) and 4B1.5(b)(1) does not result in impermissible double counting.

First, Garcia-Vazquez objects to applying both §§ 2G2.1(b)(2)(A) and 4B1.5(b)(1) as impermissible double counting. Section 2G2.1(b)(2)(A) provides a two-level enhancement when the offense involves the commission of a sexual act or sexual contact. Section 4B1.5(b)(1), in turn, adds five levels when the defendant engaged in a pattern of activity involving prohibited sexual conduct.

The Third Circuit has explained that "improper double counting occurs when a district court imposes two or more upward adjustments within the same Guideline range, when both are premised on the same conduct. However, double counting is permissible so long as the Guidelines do not explicitly prohibit simultaneous application of the provisions in question." *United States v. Seibert*, 971 F.3d 396, 400 (3d Cir. 2020) (cleaned up), *opinion clarified*, 991 F.3d 1313 (3d Cir. 2021). Within the sentencing context, "double counting is a phenomenon that is less sinister than the name implies." *United States v. Chiaradio*, 684 F.3d 265, 282 (1st Cir. 2012).

7

As recognized in *Chiaradio*, "[t]he Sentencing Commission has shown itself fully capable of expressly forbidding double counting under the guidelines when appropriate." *Id.* at 283; *see also Seibert*, 971 F.3d at 401 ("[T]he Guidelines allow for the simultaneous application of both enhancements even to the same conduct."). Accordingly, when "neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, courts should be reluctant to read in a prohibition when there is none." *Chiaradio*, 684 F.3d at 283.

There is no directive against double counting in either § 2G2.1(b)(2)(A) or § 4B1.5(b)(1). To the contrary: the Third Circuit in *Seibert* observed that "the Guidelines expressly contemplate the application of both enhancements," observing that § 4B1.5(b)(1) states that "[t]he offense level shall be 5 *plus the offense level determined under Chapters Two and Three.*" 971 F.3d at 400–01 (emphasis in original).[2] Both enhancements are therefore properly applied here.

The government has located a single district court case that addresses the precise guidelines at issue here: § 4B1.5(b)(1) and

---

2 Although *Seibert* involved U.S.S.G. § 2G2.2(b)(5) and not § 2G2.1(b)(2)(A), the point stands: § 4B1.5(b)(1) adds a five-level enhancement to whatever offense level results from the offense level set forth under Chapter Two.

§ 2G2.1(b)(2)(A). In that case, the court found no double-counting for much the same reason as in *Seibert*: "the text of [§ 4B1.5(b)(1)] 'reflects the Commission's intent that repeat offenders receive a 5-level enhancement "in addition to" any calculations in Chapters Two and Three." *United States v. Abatie*, No. 16-CR-0047, 2022 WL 4944191, at *2 (N.D. Ind. Oct. 4, 2022) (quoting *United States v. Craig*, 420 F. App'x 605, 607 (7th Cir. 2011)). And, as the PSR Addendum aptly notes, "[b]ecause the two sections of the guidelines address separate harms, both are appropriately applied here."

For these reasons, Garcia-Vazquez's first objection should be overruled.

## II. Section 2G2.1(b)(3) applies because it does not distinguish between distribution to the victim or distribution to a third party.

Garcia-Vazquez next objects that U.S.S.G. § 2G2.1(b)(3)'s enhancement for distribution should not apply because the defendant sent the CSAM video only to the victim, and not a third party. PSR Addendum 5. He is incorrect. Where, as here, applying the sentencing guidelines may implicate the United States Sentencing Commission's commentary, courts apply the three-step framework set forth in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc). First, the court determines whether a guideline provision is "genuinely ambiguous" by "carefully consider[ing] the [guideline's] text, structure, history, and purpose." *Id.* at 471 (quoting *Kisor v.*

*Wilkie*, 588 U.S. 558, 559 (2019)). If the guideline itself is unambiguous, the court simply applies the unambiguous meaning of the guideline without reference to the commentary. *Id.* If the guideline is instead ambiguous, the court proceeds to step two and considers whether the corresponding commentary is "reasonable"—meaning within "the outer bounds of permissible interpretation." *Id.* At the third step, if the commentary reasonably interprets an ambiguous provision, courts determine "whether the character and context of the agency interpretation entitles it to controlling weight," meaning that it "implicate[s] [the Commission's] substantive expertise" and "reflect[s] fair and considered judgment." *Id.* (citations omitted).

Section 2G2.1(b)(3) is not ambiguous. Its command is simple and direct: "If the defendant knowingly engaged in distribution, increase by 2 levels." It makes no distinction between distribution to the victim or to third parties. Sharing the video with the minor victim therefore falls squarely within the unambiguous plain meaning of § 2G2.1(b)(3).

Even if that subsection could be considered ambiguous, the application notes confirm that distribution includes providing the media to the victim. Application note one defines "distribution" as

> any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor. Accordingly, distribution includes

> posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant.

U.S.S.G. § 2G2.1 app. n.1. That application note does not distinguish between distribution to a victim or to a third party. Indeed, it would be passing strange if distribution included mere "possession with intent to distribute," as the application note states, but not the *actual* distribution of the material to the victim.

The Ninth Circuit addressed this precise issue in *United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2018), concluding that "the transfer of illicit pornographic images to a minor victim depicted in the images constitutes 'distribution' within the meaning of Guideline § 2G2.1(b)(3)." *Id.* at 1108. To be sure, the Ninth Circuit relied on the application notes to reach that conclusion, *id.* at 1108, and the government here maintains that "engaged in distribution" unambiguously encompasses distribution to the victim as well as third parties. But the point is twofold: first, the application notes and *Hernandez* merely exemplify the commonsense understanding that "distribution" means distribution to *anyone*—the victim included. And second, should the Court conclude that the term "engaged in distribution" is in fact ambiguous, *Hernandez* persuasively demonstrates that the application notes define "distribution" as including distribution to the victim.

For these reasons, Garcia-Vazquez's objection to the distribution enhancement of § 2G2.1(b)(3) should be overruled.

## III. Section 2G2.1(b)(6)(B)(ii) should apply because the defendant used a cellular phone to produce sexually explicit material.

Next, Garcia-Vazquez contends that U.S.S.G. § 2G2.1 (b)(6)(B)(ii) should not apply due to "the ubiquity of cell phone and/or computer access." PSR Appendix 5–7. The government understands the Court's views on this issue. Nevertheless, it is compelled to argue for its application here. The Sentencing Commission is required to meet at least twice per quarter. U.S.S.C. R. of Prac. & Proc. 3.2. The Commission surely understands the age we live in and could have rescinded § 2G2.1(b)(6)(B)(ii) at any one of those meetings. That it has not reflects the notion that digital images that can be duplicated and sent around the world at the speed of light are inherently more damaging to victims and society than analog images that cannot. The government therefore believes this enhancement is appropriate.

## IV. The pattern enhancement applies because two occurrences are sufficient to constitute a pattern under § 4B1.5(b)(1).

Garcia-Vazquez objects to the enhancement under U.S.S.G. § 4B1.5(b)(1) because "the conduct supporting the conviction for production of child pornography overlaps the conduct for the

enhancement." PSR Addendum 7. He also objects that "the temporal proximity of the two [sexual] contacts [with the minor victim] does not support the application of USSG § 4B1.5(b)(1) as it is insufficient to establish a pattern of activity." *Id.* at 7–8.

As to the first objection, it is well settled that the conduct underlying the conviction may count as one occasion of prohibited sexual conduct for the pattern enhancement. *See, e.g.*, *United States v. Broxmeyer*, 699 F.3d 265, 285 (2d Cir. 2012) ("[W]e accord Guidelines language its plain meaning: 'two' means two, not three; and 'separate' means the two occasions must be separate from each other, not that the two occasions demonstrating a pattern must be separate from (and in addition to) the crime of conviction."); *United States v. Al-Cholan*, 610 F.3d 945, 955 n.4 (6th Cir. 2010) ("Under the Guidelines, '[a] defendant [has] engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor.' These two separate occasions may include 'the instant offense,' and prior occasions need not have resulted in a conviction to qualify. 'Prohibited sexual conduct' includes federal offenses involving the abuse of children and state-law analogues." (citations omitted)); *United States v. Rothenberg*, 610 F.3d 621, 625 n.5 (11th Cir. 2010) (explaining that "either" of two occasions of prohibited sexual conduct found by district court would have been "sufficient, when

joined with the offense of conviction, to warrant the finding of a 'pattern' supporting the enhancements").

Regarding Garcia-Vazquez's objection that two instances of prohibited sexual conduct in the course of two days are insufficiently distinct to constitute a pattern, this Court has itself rejected that argument. In *United States v. Downton*, No. 24-CR-0050, 2025 WL 2233376 (M.D. Pa. Aug. 5, 2025), the Court explained that "[a] consensus among the circuits holds that these occasions must be independent and distinguishable, but not necessarily separated by substantial time, different victims, or unrelated incidents." *Id.* at *3 (Mannion, J.). The Court noted that the Fourth Circuit in *United States v. Fox*, 926 F.3d 1275 (11th Cir. 2019), had "refused the defendant's argument that § 4B1.5(b)(1) requires two unrelated incidents," instead "interpret[ing] 'separate occasions' to mean discrete events with independent identities—even if they were related or close in time—and held that repeated exploitation of the same minor satisfies the enhancement." *Downton*, 2025 WL 2233376, at *3.

So too here. The PSR states that "Garcia-Vazquez came over on two *separate* days. The first day they had sex. The next day he came over, he brought the minor victim a gold bracelet. They had sex again, and this time Garcia-Vazquez recorded them having sex." PSR ¶ 7 (emphasis added). These were two separate instances of behavior, and Garcia-Vazquez points to no caselaw for the

proposition that acts of prohibited sexual conduct committed on two separate days are insufficiently distinct to constitute a pattern under § 4B1.5(b)(1). Accordingly, this objection should be overruled.

## CONCLUSION

Garcia-Vazquez's remaining objections are to the computation of the total offense level in light of the above enhancements. Because the PSR properly computed the total offense level, those objections, too, should be overruled. The government reserves discussion of the § 3553(a) factors for the sentencing hearing on April 1, 2026.

Respectfully submitted,

BRIAN D. MILLER
UNITED STATES ATTORNEY

/s/ *Michael Scalera*

MICHAEL SCALERA
ASSISTANT U.S. ATTORNEY

Dated: March 25, 2026

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 25, 2026, I cause to be served a copy of the foregoing on all counsel of record via filing on the Court's electronic filing system.

/s/ *Michael Scalera*
Michael Scalera
Assistant United States Attorney